OKC CORPORATION and OKC Refining Company, Inc.

v.

OSKEY GASOLINE & OIL COMPANY, a Minnesota corporation and George Delegianis, Regional Director, Federal Energy Office, Region V.

Civ. A. No. CA 3–74–153–E.

United States District Court,
N. D. Texas,
Dallas Division.

Aug. 9, 1974.

William D. Treeby, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., Robert L. Meyers III, Stalcup, Johnson, Meyers & Miller, Robert F. Middleton, Dallas, Tex., for plaintiffs.

Peter Dorsey, Robert A. Schwartzbauer, Minneapolis, Minn., J. Glenn Turner, Jr., Turner, Hitchins, McInerney, Webb & Hartnett, Dallas, Tex., Richard Cagney, Anti-Trust Div., Dept. of Justice, Washington, D. C., Charles Cabaniss, Asst. U. S. Atty., Dallas, Tex., for defendants.

## MEMORANDUM OPINION

MAHON, District Judge.

This cause is before the Court for judicial review of the Federal Energy Office's [1] decisions and orders in the appeal of OKC Corp., No. 05–005310 pursuant to Section 211 of the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904 (note).

This suit was filed in February 1974 in an attempt to secure relief from certain orders of the Federal Energy Office which plaintiffs claim were irregular and invalid. At that time the Court stayed its hand, pending an administrative appeal within the agency framework. That appeal included a hearing before a hearing officer for FEO on March 21, 1974. As a result of that hearing, an undated decision and order

1. Hereinafter "FEO". This agency is now the Federal Energy Administration.

and a subsequent supplemental order dated April 18, 1974, were promulgated.[2]

OKC perfected its request for judicial review of such orders. At that time OKC also requested a stay of FEO's order and said request was denied.[3] As stated in the Court's order of May 22, 1974, the instant hearing was a judicial review and not a trial *de novo*. The Court deemed it proper at that time, however, to permit inquiry into the physical circumstances surrounding the conduct of the FEO hearing. Any doubts that the Court may have entertained, that such inquiry was not proper were dispelled by the unhappy facts revealed at the instant hearing on judicial review.

The Court initially notes the proper standard of review of FEO's order. The Emergency Petroleum Allocation Act of 1973 refers to the Economic Stabilization Act of 1970 for the appropriate standards. 12 U.S.C. § 1904 (note). Such standard is that this Court determine (1) whether the order in question was within scope of FEO's authority, i. e., was it within the boundaries of the authority prescribed by the enabling legislation and the regulations issued pursuant to such legislation, and (2) whether the orders in question were supported by substantial evidence. If each element is met then the judicial function is exhausted and this Court must uphold the order. Pacific Coast Meat Jobbers Ass'n, Inc. v. Cost of Living Council, 481 F.2d 1388, 1391–1392 (Tem.Emer. Ct.App.1973); Kelso Marine, Inc. v. Hollis, 316 F.Supp. 1271 (S.D.Tex.1970) aff'd, 449 F.2d 342 (5th Cir. 1971). On the other hand, if the orders were in excess of FEO's authority or were not supported by substantial evidence then this Court is empowered to enjoin or set aside such orders in whole or in part.

In making its determination, the Court must consider the entire record upon which the orders were based. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L. Ed.2d 136 (1971). Reviewing the record of FEO's proceedings, the Court feels obligated to take judicial notice of some of the economic realities underlying the entire matter. Breen v. Kahl, 296 F.Supp. 702, 704 (W.D.Wis.1969) (social, economic and psychological values judicially noted); IX J. Wigmore, Evidence, § 2580 (1940, Supp.1972). (notorious miscellaneous facts; commerce and industry). In January, when the improper interim FEO order was issued to OKC, the nation was in the depth of the energy crisis. The oil embargo and other factors had caused severe shortages of oil stocks and supplies resulting in concomitant dislocations in the nation's petroleum industry. At this time Oskey was in desperate need of fuel oil and gasoline and would have been able to sell every drop of product which it could have received at an economically favorable price. In fact, during the March hearing of this cause, Oskey's position was that it was willing to pay in cash in advance for any product OKC would sell it. A dollar paid for every dollar's worth of product delivered into the pipeline.[4] Shifting the scene to the instant proceeding, the economic situation has changed for the petroleum industry. Stocks of petroleum products have stabilized along with gasoline retail prices at a higher level. Most importantly, wholesale gasoline prices have stabilized by government regulation at a level that varies from area to area and from supplier to supplier. This stabilization factor has led to the anomalous situation where OKC can sell gasoline wholesale to Oskey at a legal price which would result in Oskey's paying a cost

---

2. The orders denied all relief sought by plaintiff and ordered them to begin delivery of product pursuant to FEO's original order(s).

3. Although FEO's orders were not stayed, their vagueness as to specific terms and con-

ditions have been a stumbling block to any implementation.

4. Oskey's counsel represented this to the Court in the hearing of March 14, 1974.

greater than the average retail price for its marketing area.[5] Apparently, this is not an uncommon situation and the apparent contradiction is resolved in other instances by "rolling in" such high priced product with other supplies whose legal price was lower. This averaging of cost, permit purchasers who have multiple suppliers with varying prices to market their fuel at a price competitive for their particular region.[6]

This rolling in practice, now common to the petroleum industry, poses an onerous burden to Oskey because they have no long-term supplier other than OKC at this time. This raised the question of whether or not Oskey could economically afford to accept any product which OKC did ship them.

Because of the above described economic conditions it is evident to this Court that the real problems present here are not as complex as the parties contend. Oskey has had its former position of wanting gasoline from any supplier, including OKC undercut by the fact that it cannot economically market OKC's product. The Court has been advised by counsel for OKC, Oskey and the Justice Department representing FEO that alternative suppliers for Oskey other than OKC are currently under active consideration. This approach appears to be a wise one in the Court's view.[7]

Refining down the crude position of the respective parties, the Court finds FEO realizes the economic obstacles present and in asserting the position that its orders are valid and should be upheld, desires primarily to maintain its administrative integrity; Oskey is in an economic bind vis a vis the product which FEO ordered OKC to supply, but is asserting its position to maintain the availability of a supplier through the mandatory fuel allocation program should OKC prevail in this Court; OKC, maintains its original position that it falls within the 10 C.F.R. § 210.62 exception and that FEO's orders were in contravention of this section.[8] Additionally, it advances concern that because of the adverse economies, Oskey would be unwilling to actually take any product proffered them at Minnesota delivery points and this would place OKC in a questionable position with their pipeline carrier.

It is against the backdrop of the economic situation and the respective positions of the parties, that the Court now examines FEO's orders. Paragraph three of the initial decision is the significant portion of the decision now under attack. As previously stated, this Court is limited in its review to ascertain whether or not the order was in excess of the agency's authority and was sup-

---

5. The testimony at the instant hearing indicated that major petroleum retailers were marketing gasoline at an average pump price of 52.9 cents per gallon in the Minneapolis-St. Paul area. *See* Vol. 72, No. 26 Oil & Gas Journal, July 1, 1974, at p. 92. Testimony concerning the cost of any gasoline Oskey would purchase from OKC, indicated that it would be in excess of this amount by several cents per gallon.

6. Testimony was undisputed that at the time of the instant proceeding the wholesale price at which the so-called major suppliers marketed product was in the high twenty-cent range. OKC's legal wholesale price was thirty-five cents per gallon.

7. OKC and Oskey are now in agreement as to the fact that they do not want to do business with each other and would not do business with each other absent a directive from either FEO or this Court.

8. 10 C.F.R. 210.62 provided:
   "Suppliers will deal with purchasers according to normal business practices. Nothing in this program shall be construed to require suppliers to sell to purchasers who do not arrange proper credit or payments for products. However, no supplier may require or impose more stringent credit terms or payment schedules on purchasers than the normal business practice of the supplier for that class of purchasers (*e. g.* COD purchasers) during the base period, nor may any supplier modify any other normal business practice so as to result in circumvention of any provision of this chapter."

ported by substantial evidence. OKC strongly asserts that the orders are beyond the pale of FEO's authority in the following ways:

1. The decisions and orders ignores Section 210.62 in that it does not conclude that it was not a "normal business practice" of OKC to cease business relationships with poor credit risks, and that no consideration was given to the past credit relationship between OKC and Oskey.

2. The decisions and orders ignored the Congressional policy expressed in Section 4(b)(1) of the Emergency Petroleum Allocation Act of 1973.

3. The decisions and orders are incomplete in that they fail to prescribe the terms and conditions of delivery and that such terms are of paramount importance in the dispute between OKC and Oskey.

██ Turning briefly to the first two of these points, the Court reluctantly finds that it is the expertise of the agency to which it must defer when examining agency orders.[9] Federal Power Commn. v. Florida Power & Light Co., 404 U.S. 453, 462–469, 92 S.Ct. 637, 643–646, 30 L.Ed.2d 600, 609–613 (1972).

It is evident from the entire record presented to this Court that FEO at worst neglected its responsibilities in this matter to provide meaningful and clear guidelines to those subject to its sway and to the general public.[10] The FEO decision under scrutiny is devoid of any clear findings directed to the issue of credit relationships between OKC and Oskey. Paragraph three is cap-

tioned "Normal Business Practices Do Not in this Instance Allow OKC to Avoid its Obligations to Supply Oskey". The subsequent thrust of the FEO decision is then as follows: OKC argues it fits within the 210.62 exception to supply a product to Oskey because of past credit difficulties; FEO chronologized the entire business relationship between OKC and Oskey but made no attempt to show any correlation between this past credit experience and Oskey's ability to "arrange proper credit" for the purchase of product under FEO's orders. It is devoid of findings or conclusions on past credit relationships and normal business practices. The Court has not been shown, nor has it found any subsequent regulation or ruling which illuminates the precise question presented by OKC, i. e., how do past credit experiences mesh with FEO's concept of a "normal business practice" and how these experiences relate to the arranging of "proper credit."[11]

██ .OKC next asserts invalidity of FEO's order because they are not predicated upon substantial evidence. Generally, the Court is sympathetic to OKC's position that the decisions and orders are not supported by substantial evidence. Substantial evidence is a term of art which describes the framework within which a reviewing court judges an administrative record. The Supreme Court explains the standard as going " . . . to the reasonableness of what the agency did *on the basis of the evidence before it,* for a decision may be supported by substantial evidence even though it could be refuted by other evidence that was not presented to the decision-making

---

9. The Emergency Petroleum Allocation Act of 1973 in establishing a mandatory allocation program directed that regulations promulgated under the program should consider the enumerated policies "to the maximum extent practicable." Section 4(a), Emergency Petroleum Allocation Act of 1973.

10. *See,* this Court's Appendix to Order on Pre-trial Conference, May 22, 1974.

11. FEO Ruling 1974-10 Changes in Credit Terms (April 30, 1974) is advanced by FEO and Oskey as being dispositive of this issue.

The Court does not share this view. Ruling 1974-10 relates only to changes in credit terms between suppliers and purchasers, i. e., a supplier may not, under this ruling, impose more stringent credit conditions upon parties to whom they have an allocation mandate, than it did during the base period. This is consistent with 10 C.F.R. § 210.62 (1974), but sidesteps the questions of normal business practices, poor credit risks, and past credit experiences between supplier and purchasers.

body . . ." United States v. Bianchi & Co., 373 U.S. 709, 715, 83 S.Ct. 1409, 1414, 10 L.Ed.2d 652, 658 (1963) (emphasis in original text).[12]

■ An order which is not supported by substantial evidence is one which will also fail because of lack of procedural due process because of the close relation between the two concepts. An administrative order which is not reasonably supported by the evidence is inherently arbitrary and lacking in due process. Sterling Davis Dairy v. Freeman, 253 F.Supp. 80, 82 (D.N.J.1965).[13] In any event, it is the nature of the proceeding in question which is of critical importance in determining whether the record is devoid of substantial evidence because of procedural irregularities. *Cf.* Hayes v. Celebrezze, 311 F.2d 648, 651 (5th Cir. 1963). Because of the wide latitude permitted FEO by the enabling legislation and its own regulations, I am unable to conclude that the deficiencies present at the FEO hearing of March 21, 1974, deprived plaintiffs of due process so as to vitiate the proceedings because of a lack of substantial evidence.

The Court's inquiry into those circumstances surrounding the physical surroundings and decision making processes at FEO has, however, revealed deficiencies which although do not rise to the level of impermissible conduct, are irregular. Testimony of the hearing officer and admissions by FEO's counsel, aptly demonstrate that the motivation of having an informal type hearing was to facilitate communication between the parties.[14] The Court recognizes this may be a worthy cause but it is evident that in this particular instance, FEO's approach did everyone concerned a disservice. In fostering informality they bred suspicion. In encouraging dialogue they invited surreptitious communications. In short, whatever their intentions, FEO misperceived the effects of these efforts.[15]

The Court agrees with OKC in its contention that the decisions and orders of FEO are irregular and deficient. They may be also unwise. However, under the standards for judicial review of such orders, the Court is constrained to find that FEO was acting within its lawful authority, that there was a rational basis to their orders, and that said orders were supported in the record by substantial evidence. Pacific Coast Meat Jobbers Assoc., Inc. v. Cost of Living Council, 481 F.2d 1388 (Tem.Emer. Ct.App.1973); Associated General Contractors of America v. Laborers, Local 612, 476 F.2d 1388, 1404 (Tem.Emer.Ct. App.1973). Accordingly, it is ORDERED that the decisions and orders of FEO be and are in all respects affirmed. It is further ORDERED that OKC begin immediate compliance with said orders in a manner consistent with the terms hereinafter presented.

1. OKC is to begin immediate delivery of the product specified in FEO's orders subject to space available in the Williams Brothers' pipeline. Such delivery is to be made on a regular and periodic basis in a manner customary and

---

12. *See,* Rochester Tel. Corp. v. United States, 307 U.S. 125, 139–140, 59 S.Ct. 754, 83 L.Ed. 1147 (1939) (discussing issues which are appropriate for judicial review of administrative orders; these include "basic prerequisites of proof.").

13. *See,* Lechich v. Rinaldi, 246 F.Supp. 675, 684 (D.N.J.1965) (substantial evidence found wanting in part because of procedural due process irregularities).

14. The transcript of that hearing reflects this fact.

15. Some questionable circumstances which came to light at the hearing include: presence of an ill disclosed tape recorder; refusal of FEO to swear witnesses; and the unwillingness for FEO to have the proceedings reported by a court reporter. The most serious irregularity in this Court's view is an apparently unsolicited "friendly" ex parte communication from one of the parties to the hearing officer after the hearing. This is a most serious result from FEO's attempt to be informal.

similar to those deliveries made to customers of the same size and posture of Oskey. Various factors to be considered in any delivery schedule shall include: the refinery capacity of OKC; the availability of space in Williams Brothers' pipeline; and the receiving capacities of Oskey at their normal delivery points.

2. Such products will be deemed sold to Oskey upon entry to the pipeline system by OKC.

3. OKC may bill Oskey through normal invoicing procedures at such time when product enters the pipeline system but the actual amounts are not owing until:

(a) Oskey actually withdraws the product; upon such withdrawal payment for the quantity withdrawn by Oskey is to be effected to OKC within seventy-two (72) hours from the time Oskey actually draws the product. Oskey is hereby ordered to take and withdraw product shipped pursuant to this order, in an orderly, regular, and businesslike fashion; or

(b) If product is not withdrawn within a reasonable time subsequent to its being made available to Oskey, then payment is to be made within twenty (20) days from the date of its entry into the pipeline.

4. The transaction is to be secured by an irrevocable letter of credit in the amount of one million dollars ($1,-000,000.00).

5. If Oskey fails to make payment within the specified time period and efforts to secure such amounts owing are frustrated by any failure of Oskey's letter of credit in any way, then OKC's obligation to make any further deliveries to Oskey is terminated until further order of this Court.

This Court expressly retains jurisdiction over this matter to insure the good faith of the parties, delivery of product by OKC to Oskey pursuant to FEO's orders, and prompt payment for such product by Oskey.