Gerald W. GUYER et al., Plaintiffs,

v.

CITIES SERVICE COMPANY, a Delaware corporation and Cities Service Oil Company, a Delaware corporation, Defendants.

Civ. A. No. 74–C–252.

United States District Court,
E. D. Wisconsin.

Sept. 19, 1974.

**8**

Daniel W. Hildebrand, Madison, Wis., for plaintiffs.

John M. Winter, Madison, Wis., for defendants.

## DECISION AND ORDER

REYNOLDS, Chief Judge:

This is an action by the operators of six gasoline stations for both injunctive relief and damages against Cities Service Company and its wholly owned subsidiary, Cities Service Oil Company (hereinafter "Citgo"). The plaintiffs have moved for a preliminary injunction restraining Citgo from terminating or refusing to renew the leases and agreements which they have entered into with Citgo. They also seek to have Citgo enjoined from refusing to supply them with gasoline, from engaging in "retaliatory or discriminatory conduct," and for "any other relief as may be just and proper." For reasons hereinafter indicated, plaintiffs' motion for a preliminary injunction is hereby denied.

## JURISDICTION

The court's jurisdiction of this case is under 28 U.S.C. § 1331 (federal question), § 1332 (diversity) and § 1337 (commerce), as it arises under the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751–756 (hereinafter "the Act"). The amount in controversy exceeds $10,000 as to each of the plaintiffs.

## FACTS

The seven plaintiffs are the operators of six gasoline stations in the County of Milwaukee. (Plaintiffs Horvath and Aramo are partners.) They have executed station leases, equipment leases, products agreements, and credit card agreements with Citgo. Each of these documents is typically for a one-year term, and is automatically renewed unless either party gives a written notice of termination ninety days prior to the renewal date.

Citgo has advised six of the plaintiffs that their leases and agreements will not be renewed. Three of the plaintiffs, operators of two stations, have received termination notices effective on September 30, 1974. Two other plaintiffs have renewal dates of December 31, 1974. One plaintiff's renewal date is February 28, 1975.

The seventh plaintiff, Floyd Fullington, also has a renewal date of February 28, 1975, and has not been definitely informed whether he can expect to operate past that date.

The situation of the plaintiffs here is one of long standing in the gasoline industry. They do not own the station where their business is conducted, but rather lease it from the owner, Citgo, under the aforementioned "station lease." The equipment leases allow the plaintiffs to use equipment owned by Citgo in the operation of the stations. The products agreements provide for the sale of gasoline and other Citgo products to the plaintiffs. The credit card agreements provide for the use of Citgo credit cards at the plaintiffs' stations.

No allegations have been made in this suit that any of the parties has violated the aforementioned leases and agreements. Nor have the plaintiffs alleged that the leases and agreements are illegal or unenforceable as a matter of contract law.[1] Further, Citgo has not alleged that it is terminating the plaintiffs "for cause", but only seeks to rely on its rights under the leases and agreements.

---

1. The parties have also agreed that the Wisconsin Fair Dealership Law, Ch. 135, Stats.(1973), is not applicable here.

The affidavits of Citgo's officers and agents establish further that Citgo has guaranteed to each of the plaintiffs that Citgo will continue to supply them with any gasoline they are entitled to under the allocation program of the Federal Energy Administration (hereinafter "FEA").

From the pleadings and affidavits on file, it is apparent that Citgo had 75 stations in the Milwaukee County area as of July 1, 1973. By June 21, 1974, some 30 of these stations had closed, two more intended to close, and three stations had been bought by the operators.

Citgo has admitted that it is reducing the number of service stations it owns in the Milwaukee area, and has a number of stations for sale. Citgo intends to buy some new properties and convert some of its old properties to "Quick Mart" stations, which will be owned by Citgo and operated by it. If successful, Citgo will have achieved vertical integration of its gasoline business.[2]

All the plaintiffs except Fullington have filed affidavits alleging their inability to relocate their business within one mile of their present locations. Plaintiff Brodhagen apparently did have an opportunity to move across the street from his present location, but was unable to accomplish this. Plaintiffs Horvath and Aramo have apparently found a new location, but as yet have no operating permit from the municipality involved.

The relationship which the plaintiffs have had with Citgo has lasted for some time—Fullington has operated his present business for some 23 years; Brodhagen for 13 years; Dowodzenka and Guyer for 10 years; and Karnes, Horvath and Aramo for two years.

Plaintiffs filed their complaint on June 20, 1974. On June 26, 1974, plaintiffs filed a motion for a preliminary injunction, accompanied by briefs. On August 12, 1974, Citgo filed its answer and a brief in opposition to the plaintiffs' motion for a preliminary injunction, along with affidavits. Thereafter, on August 20, plaintiffs filed a reply brief and several affidavits. Oral argument was held on September 5, 1974.

### PRELIMINARY INJUNCTION

There are essentially four factors which must be considered in deciding whether to grant a preliminary injunction. They are, (1) the likelihood that plaintiffs will succeed on the merits at trial, (2) whether irreparable harm will result to plaintiffs if the injunction is not issued, (3) whether the injury to plaintiffs if the injunction is denied outweighs any foreseeable harm to the defendant, and (4) the public interest. 7 Moore, Federal Practice 65.04[1], 65–39 to 65–45. *Cf.*, Whitney v. Board of Regents of University of Wisconsin, 355 F.Supp. 321 (E.D.Wis.1973); Waier v. Schmidt, 316 F.Supp. 407 (E.D.Wis. 1970). Because the plaintiffs here have not shown a "strong likelihood of prevailing on the merits," *Whitney, supra,* 355 F.Supp. at 323, the plaintiffs' motion for a preliminary injunction must be denied.

### THE EMERGENCY PETROLEUM ALLOCATION ACT OF 1973

The Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751–756 (hereinafter "the Act"), was passed by the Congress in response to the recent "energy crisis." In § 2(b) of the Act, its purpose is described as:

" * * * to grant to the President of the United States and direct him to exercise specific temporary authority to deal with shortages of crude oil, residual fuel oil, and refined petroleum products or dislocations in their national distribution system. The authority granted under this Act shall be exercised for the purpose of minimizing the adverse impacts of such

---

2. No claims have been made by the plaintiffs that Citgo's actions here are in violation of the antitrust laws.

shortages or dislocations on the American people and the domestic economy."

Section 4(a) of the Act provided for authority of the President to promulgate regulations for a mandatory allocation system of petroleum products. Section 4(b) provided:

"(1)   The regulation under subsection (a)   .   .   ., to the maximum extent practicable, shall provide for—

\*      \*      \*      \*      \*      \*

"(D)   preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers; \*   \*   \*"

The plaintiffs have argued that this section shows it was the intent of Congress to protect independent branded marketers, like plaintiffs, from the termination of their leases. But the legislative history of the Act indicates that while Congress may have been concerned with the plight of the "independents" and the vertical integration of the oil industry, Congress did not attempt to solve these problems in the Act.

In the Senate version of the Act, S. 1570, § 110(a)(2) read:

"(2)   A petroleum refiner or a petroleum distributor shall not cancel, fail to renew, or otherwise terminate a franchise unless the petroleum retailer or petroleum distributor whose franchise is terminated failed to comply substantially with essential and reasonable requirement of such franchise or failed to act in good faith in carrying out the terms of such franchise, or unless such refiner or distributor withdraws entirely from the sale of petroleum products in commerce for sale other than resale in the United States."

The House, however, was of the opinion that the legislation should be concerned solely with the allocation of scarce fuels, rather than attempting to regulate the structure of the gasoline industry.   The Conference Committee reported, " \*   \*   \*   the conferees have determined not to include the dealer protection provisions which were contained in the Senate bill."   U.S.Code Cong. & Admin.News, 93d Cong., 1st Session, Vol. 2, p. 2707.

The Conference Committee was concerned with vertical integration, however, and stated that, "Should it be shown to be progressing in a manner which cannot be dealt with under the allocation authority   \*   \*   \*   it may be in order for the Congress to consider remedies such as proposed in the Senate bill or as may be appropriate in the formulation of tax, import and anti-trust policy."   *Supra* at 2707.

The House Report also expresses concern for independent branded distributors such as plaintiffs.   But in discussing paragraph (D), *supra,* the House Report disavows any intention to freeze the existing structures in the industry.

"The Committee believes that economic efficiency, which is explicitly named as an objective in paragraph (F), is generally better served by competitive markets than by administrative measures.   If the current distress of independent refiners, branded independent marketers and non-branded independent marketers is subsequently shown to reflect a permanent shift in competitive advantage in favor of the large integrated oil companies, it may be in order for Congress to consider remedies in the field of tax, import and anti-trust policy. However, the direct allocation program established pursuant to this bill is not for the purpose of *permanently* reforming the structure of enterprise or incentives in the petroleum industry.   In this regard the Committee wishes to emphasize that this is temporary authority which will expire ap-

proximately 18 months after enactment on February 28, 1975." *Supra* at 2596. (Emphasis in original).

■ The conclusion that the Act was not intended to affect the rights of gasoline suppliers to terminate service station leases is buttressed by a bill reported by the Senate Committee on Commerce on August 5, 1974. S. 1694 is entitled, "Fair Marketing of Petroleum Products Act," and contains extensive provisions and restrictions on termination of leases and agreements. At p. 2 of S.Rep. No. 93–1071, 93d Conv., 1st Session, the Committee stated:

"During the consideration of S. 1570, the Emergency Petroleum Allocation Act (P.L. 93–159) an amendment (No. 159) was adopted by the Senate which embodied the substance of the bill reported herein. But, that portion of the amendment having to do with protection for franchised dealers was not adopted by the committee of conference."

■■ This Court therefore concludes that the most that Congress intended the Act's allocation system to provide was some temporary protection for independent · branded marketers such as plaintiffs by providing that the supplier must continue to supply them with the allocated product, even if they move to another location. (Whether this is effective relief is not before this Court.) The affidavits of Citgo's officers and agents establish that Citgo stands ready to comply with the allocation program imposed on it under the Act. But the deletion of the "dealer protection" provisions of the Senate bill compels this Court to conclude that Congress was not attempting to regulate lease terminations by passing the Act.

## FEA APPROVAL

Plaintiffs have argued, however, that the FEA regulations requiring Citgo to continue to supply gasoline to them have the effect, in this case, of requiring FEA approval before Citgo can terminate the station leases.

10 C.F.R. § 211.9(a)(2)(i) provides in relevant part:

" * * * the suppliers/wholesale purchaser—reseller relationships * * * shall be maintained for the duration of the Mandatory Petroleum Allocation Program and may not be waived or otherwise terminated without the express written approval of FEO."

Plaintiffs point to 10 C.F.R. § 211.-106(e), which states that in order to continue receiving their allocations from Citgo, plaintiffs must find a new site, where they would serve "substantially the same customers or market that was served by the former site."

Thus plaintiffs argue that because of their inability to relocate to sites serving substantially the same customers, they will lose their allocations if their leases are terminated. They contend, therefore, that Citgo's action in terminating the leases will have the practical effect of causing the supplier/wholesale purchaser-seller relationships to end, which requires FEA approval.

■ At oral argument, Citgo did not appear to concede that plaintiffs were unable to relocate and serve substantially the same customers. This fact issue need not be resolved, however, since even if plaintiffs could show that the practical effect of the termination of the leases would be to end their allocations, they still could not prevail.

■ The difficulties of relocating and the possible loss of allocations were risks which Congress and the FEA placed on "independents" such as plaintiffs. To require Citgo to forego termination of the leases because plaintiffs might lose their allocations would be to indirectly regulate the termination of leases, something which Congress had determined not to do directly. To read the regulations as requiring FEA regulation of lease terminations when Congress had decided not to forbid such terminations would turn the legislative system on its head. It is axiomatic that an administrative agency can only adopt

regulations which comply with Congress' intent. Dixon, et al., v. United States, 381 U.S. 68, 74, 85 S.Ct. 1301, 14 L.Ed. 2d 223 (1965).

The Court concludes, therefore, that the FEA regulations do not require FEA approval of these lease terminations.

### RETALIATORY ACTION

Plaintiffs point also to 10 C.F.R. § 210.61, and urge that the action of Citgo in terminating their leases is in retaliation for the plaintiffs' exercise of their rights to receive their gasoline allocations.

Section 210.61 reads, in relevant part:

"No firm * * * may take retaliatory action against any other firm (including an individual) that files or manifests an intent to file a complaint of alleged violation of, or that otherwise exercises any rights conferred by the Act, any provisions of this part, or any order issued under this Chapter. For the purposes of this paragraph, 'retaliatory action' * * * may include a refusal to continue to sell or lease. * * * "

It is uncontested here that plaintiffs have filed no complaints with FEA. Further, plaintiffs have presented no proof that Citgo is terminating their leases because they have received FEA gasoline allocations. Thus, this Court concludes that plaintiffs have not established a probability of success in establishing that Citgo was in violation of § 210.61 at a trial on the merits.

### NORMAL BUSINESS PRACTICES

■ Plaintiffs' final argument is that termination of their leases is contrary to 10 C.F.R. § 210.62. Section (a) provides, in relevant part:

"(a) Suppliers will deal with purchasers of an allocated product according to normal business practices in effect during the base period specified in Part 211 for that allocated product, and no supplier may modify any normal business practice so as to result

in the circumvention of any provision of this chapter. * * * * "

In Ruling 1974–3, on February 4, 1974, the FEA stated:

" * * * termination by a supplier of leases with base period purchasers—as part of a program of withdrawal from a region—may be determined to be in violation of Section 210.62 of the Regulations which requires suppliers to deal with purchasers according to 'normal business practices' and prohibits modification of 'normal business practices' so as to result in circumvention of any provision of the Regulations. Because the Regulations impose a continuing responsibility upon a supplier to provide allocations to his base period wholesale purchasers despite its withdrawal from a region, action which is in furtherance of a program of withdrawal by the supplier from a region may not be considered a 'normal business practice' until the Federal Energy Office authorizes a program of reassignment of that supplier's base period purchasers to other suppliers in the region."

Plaintiffs have argued that the interpretative ruling set out above shows that the FEA has attempted to regulate the termination of leases. An examination of the ruling reveals that it is inapplicable to the facts of this case.

First, the ruling only refers to situations where the supplier terminates leases "as part of a program of withdrawal from a region." Here, the evidence is clear that Citgo is not withdrawing from the Milwaukee County area, but is rather changing the structure of its business. The affidavit of W. D. Toburen shows that Citgo's plan is that, when stations close and their allocations end, Citgo will increase the allocations of the remaining stations in the same market by a proportionate amount to each. Exhibit B to his affidavit shows that the FEA has approved of this plan. Further, while plaintiffs have alleged that Citgo eventually intends only to operate Quick-Mart stations in the Mil-

waukee area, this does not mean that Citgo will be selling the gas formerly allocated to independents like plaintiffs elsewhere. Before Citgo can allocate gas supplies formerly sold in the Milwaukee County area to other regions of the country, it must receive FEA approval. 10 C.F.R. § 211.14(a), (b). Thus, one reason for the inapplicability of the ruling is that the facts do not show that Citgo is engaged in a program of withdrawal from the Milwaukee County area.

Secondly, the last sentence of the ruling as cited above shows that the FEA has determined that termination of leases is not, per se, evidence of non-normal business practices. The ruling allows a supplier to totally withdraw from a region, so long as it institutes a program of reassignment of purchasers to other suppliers. Thus, as long as a gasoline supply is available to the supplier's base period purchasers, lease cancellations are irrelevant. Since here, Citgo has offered to continue to supply plaintiffs with their gasoline allocations, it appears to be complying with this FEA regulation. A distinction must be drawn between Citgo's supplying of the allocated product, which is required by the regulations, and its leasing of the stations and equipment, which is not.

Further support for the conclusion that the regulations do not apply to termination of leases is found in Russell v. Shell Oil Co., 382 F.Supp. 395 (E.D. Mich.1974). In footnote six, the Court quoted from a FEO letter that, "the agency does not attempt to interfere nor interpret the rights and remedies under dealer agreements and leases."

But apart from the FEA ruling interpreting § 210.62, plaintiffs have argued that the facts of this case show that lease terminations are not the normal business practice, as required by the regulation. Citgo has argued that the only evidence of normal business practices is the leases themselves, and that the normal business practice is to enter into leases terminable without cause or reason. The Court believes, however, that the actual and practical normal business practices of Citgo must be examined, for if Citgo has customarily not exercised its rights under service station leases, then that may constitute the normal business practice.

The problem for plaintiffs, however, is that they have not offered sufficient proof that termination of their leases without cause or reason is not a normal business practice. The only piece of evidence plaintiffs can point to is the closing of 32 of 75 Citgo stations in about a year. But this fact is ambiguous, since plaintiffs have not explained whether these closings were caused by lease terminations or by the diminished supply of gasoline and the uncertain economic future for independent service station operators. Thus, in the absence of further proof of what normal business practices are, and how Citgo's lease terminations are deviations, plaintiffs must fail.

This decision shall constitute the Court's findings of fact and conclusions of law, pursuant to Rule 52(a), Federal Rules of Civil Procedure.

This Court is aware of the plight of the plaintiffs, but in the absence of a provision in the law protecting these plaintiffs, this Court is unable to grant them the relief they seek.

It is therefore ordered that plaintiffs' motion for a preliminary injunction be and it hereby is denied.