**Gordon A. VOLD, Plaintiff,**

v.

**MARATHON OIL COMPANY, Defendant.**

**Civ. A. No. C 75–0056L(A).**

United States District Court,
W. D. Kentucky,
Louisville Division.

July 7, 1975.

Thomas W. Burks, Louisville, Ky., for plaintiff.

Brown, Todd & Heyburn, Charles S. Cassis, R. James Straus, Louisville, Ky., for defendant.

ALLEN, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, Gordon A. Vold, filed a complaint against the defendant, Marathon Oil Company, on February 21, 1975 seeking to have enjoined the actions and practices of the defendant varying and changing the terms of plaintiff's credit on purchases of petroleum products for sale at retail, and also for varying and changing the method of rent payments and terms relating thereto contrary to law, equity and Federal Energy Administration Regulations.

Jurisdiction on the Court was bestowed by 28 U.S.C § 1331 (federal question), § 1332 (diversity) and § 1337 (commerce), as it arises under the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. §§ 751–756, (hereinafter the Act). The amount in controversy exceeds $10,000.

On February 28th of this year, the Court entered a temporary restraining order enjoining the defendant from refusing to deliver gasoline to the plaintiff on terms other than load-to-load, and further reciting that plaintiff would receive a load of 7,700 gallons from the defendant on or before March 3, 1975. Plaintiff was required to post a bond in the form of cash or certified check in the amount of $1,500 which he did.

While this action was pending, defendant filed an action in the Jefferson County First Magisterial District Court seeking a writ of forcible detainer against the plaintiff from possession of the gasoline station occupied by him and owned by the defendant. The First Magisterial District found the plaintiff to have been guilty of the forcible detainer, and this Court enjoined the defendant from carrying out a writ of possession granted to it by the Magisterial Court, and from taking further steps in that court until the motion of the plaintiff for a preliminary injunction had been heard.

It was established at the hearing on the motion for a preliminary injunction that plaintiff had entered into a lease with the defendant of a gasoline station located in the Lyndon, Kentucky area, the lease being for a period of one year, subject to the right to renew at the end of each year. The lease provided that the lessee should pay as rent for the premises the sum of 1¾ cents per gallon for every gallon delivered to plaintiff's station for resale, provided that the sum payable should not be less than $438 per month.

It was agreed, in paragraph 4 of the lease, that the time for rental payment, pursuant to the terms, was of the essence in the lease, and if lessee did not pay each and every installment on or before the day when it became due, defendant could declare the lease forfeited and terminated immediately without making demand for payment of the rent. The lease also gave Marathon the right to enter in and repossess the premises without demand or notice.

The lease was renewed in 1973 and again in 1974. When the lease was first entered into, the plaintiff was placed on the meter plan by the defendant and that policy continued until October, 1974, at which time he was placed on the load-to-load plan. Under the meter plan, the salesman of the defendant goes to the plaintiff's filling station and calculates the number of gallons dispensed or sold for a previous seven day period. He does this on seven day increments and effects collection at that time.

Under the load-to-load method, the dealer is charged with paying for a previous load received or billed to him prior to receiving a second load of product.

On May 14, 1973, immediately before the Act went into effect, there were 120 Marathon dealers in plaintiff's classification; 69 of these were on a load-to-load basis and 51 were on the meter plan.

The meter plan method was not intended to be permanent or long-term but the primary purpose was to assist a new dealer in getting on his feet so that he could transfer to the load-to-load basis and become self-sufficient.

Plaintiff, with the exception of two months, did not sell sufficient gasoline to meet the minimum monthly rental payments. As a result, he was deficient in these payments at the end of the first and second fiscal years of his operation. He was allowed by the defendant to fall behind in his payments of these amounts and to liquidate them over a period of some five and one-half months in one year and over a shorter period of time in the other year.

On December 12, 1974, defendant sent to plaintiff an invoice stating that he owed Marathon $473.94 for the first quarter of fiscal 1974–75. On January 27, 1975, a second invoice was sent to plaintiff stating that he was deficient in the amount of $510.75, representing the arrearage on the second quarter rent on fiscal 1974–75. Following receipt of this second invoice, plaintiff took a check for approximately $1,300 to the defendant's bulk plant in Louisville and left an order for an additional load of gasoline. This was on February 3, 1975, and when plaintiff did not receive a load within 48 hours, he called the defendant and was advised that he had been placed on a C. O. D. basis. At that time he was current, insofar as payments for the gasoline were concerned, but was in arrears on the minimum rent due to the tune of approximately $984.69. Very shortly thereafter, defendant thereupon failed to provide plaintiff with any gasoline for the month of February, and as a result, plaintiff only pumped a total of 3,500 gallons for that month, which he received through the offices of the Nay Oil Company. Gasoline was received by the plaintiff from the defendant on March 4th, pursuant to this Court's order, and it has been so received since that time.

Plaintiff has four employees in his service, the only full-time one being his son and one of the part-time ones being his wife. His gasoline sales have varied from 17,738 gallons in August, 1974 to 3,512 gallons in February, 1975. In the month of April, 1975, his sales were approximately 15,500 gallons, and they have never exceeded 17,738 gallons since August, 1974, although it is obvious that a sale of 25,100 gallons per months would be the amount required to meet the minimum monthly requirements from gasoline sales.

Plaintiff was, for 34 years, a civil engineer, but subsequent to that time went into the filling station business to earn a living. Prior to becoming one of Marathon's dealers, he was a Shell Oil Company dealer, and in that capacity lost some $7,000 in the last year of his operations with that company.

Plaintiff claims to have made a profit of $9,936 in his last fiscal year of operation, but the figures submitted by him are not completely convincing on this score, but be that as it may, it is obvious that he has fallen way short of meeting what was apparently the mutual hope of the parties that he could sell at least 25,100 gallons per month, and that any amount sold above 373,000 gallons a year might be considered an above-average or excellent performance.

Defendant claims that his relations with plaintiff have been unsatisfactory in that several bad checks were received by it from him, and that his open accounts became delinquent. However, it is established that all the bad checks were made good, and that the only amounts actually owing to the defendant are those for the rental payments.

The Act was passed in 1973 by Congress in response to the recent energy crisis. Its purpose was to grant to the President of the United States specific temporary authority to deal with shortages of crude oil, residual oil and refined petroleum products or dislocations in the national distribution system. The authority was to be exercised so as to minimize the adverse impact of such shortages or dislocations on the American public and domestic economy. See 15 U.S.C § 751(b).

Section 753(b)(1)(D) U.S.C. 15 provided, in substance, that the President should promulgate regulations for a mandatory allocation system of petroleum products, and that the regulations should provide for preservation of an economically sound competitive industry, including priority need to foster competition and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers.

Plaintiff's primary arguments in this case are based on 10 C.F.R. § 210.62(a) which provides as follows: "Normal business practices.

"(a) Suppliers will deal with purchasers of an allocated product according to normal business practices in effect during the base period specified in Part 211 for that allocated product, and no supplier may modify any normal business practice so as to result in the circumvention of any provision of this chapter. 'Summer fill' programs and other 'dating' or seasonal credit programs are among the normal business practices which must be maintained by a supplier under this paragraph, if that supplier had such programs in effect during the base period. Credit terms other than those associated with seasonal credit programs are included as a part of the May 15, 1973 price charged to a class of purchasers under Part 212 of this Chapter. Nothing in this paragraph shall be construed to require suppliers to sell to purchasers who do not arrange proper credit or payments for allocated products, as customarily associated with that class of purchaser during the base period (for seasonal credit), or on May 15, 1973 (for other credit terms). However, no supplier may require or impose more stringent credit terms or payment schedules on purchasers than those in effect for that class of purchaser during the base period (for seasonal credit) or on May 15, 1973 (for other credit terms)."

Another argument made by plaintiff is that the action taken by Marathon in terminating his lease is contrary to 10 C.F.R. § 210.61, which reads as follows:

"Retaliatory actions.

"No firm (including an individual) may take retaliatory action against any other firm (including an individual) that files or manifests an intent to file a complaint of alleged violation of, or that otherwise exercises any rights conferred by the Act, any provision of this part, or any other issued under this Chapter. For the purposes of this paragraph, 'retaliatory action' means any action contrary to the purpose or intent of the Economic Stabilization Program or the Federal Energy Administration and may include a refusal to continue or sell or lease, any reduction in quality, any reduction in quantity of services or products customarily available for sale or lease, any violation of privacy, any form of harassment, or any inducement of others to retaliate."

A comprehensive discussion of the intent of Congress and the administrative agency appears in the decision of *Guyer v. Cities Service Company*, 381 F.Supp. 7 (E.D.Wis.1974). *Guyer* held that the operators of six gasoline stations who had been notified that their leases would not be renewed were not entitled to a preliminary injunction restraining Citgo from terminating the leases at the end of the lease term. Chief Judge Reynolds, in *Guyer*, stated that the actual and practical normal business practices of Citgo had to be examined, and that the fact that the leases themselves provided for termination at the end of the term did not, in itself, constitute the normal business practice which is required under 10 C.F.R. § 210.62. The court stated that if Citgo had customarily not exercised its rights under service station leases, then that might constitute its normal business practice. He held, however, that plaintiffs had not offered sufficient proof that termination of their lease without cause or reason was not a normal business practice and that the only piece of evidence that the plaintiffs

could point to was the closing of 32 of 75 Citgo stations in about one year.

Plaintiff relies on the decision of the United States Court of Appeals for the Fourth Circuit in *Call Carl, Inc. v. BP Oil Corporation*, No. 74–1819 decided April 1, 1975. In that case a preliminary injunction was entered restraining the defendant-appellants from refusing to renew expired gasoline station leases, franchises, or other like contracts, including dealerships with the four plaintiff-appellees. Seasonable notice of the proposed termination had been given each of the appellees but they maintained that they had been promised that the appellants would extend the life of the occupancies so long as the operations were continued in satisfactory performance.

No proof was offered by the appellants as to any failure of the appellees to maintain their operation in accord with the condition of satisfactory performance.

Unfortunately, for the purposes of this Court, the Fourth Circuit did not set out the reasoning of the district judge, and no discussion was had as to the meaning of 15 U.S.C. §§ 751–756 and the regulations which are the subject of controversy here. We can infer, however, that Judge Young, the able district judge who issued the temporary injunction, did so partially on the theory that it was a normal business practice for the oil companies to continue their year-by-year leases with gasoline dealers when their conduct of the business has been satisfactory, and of course Judge Young had the benefit of proof on this subject, whereas in *Guyer* plaintiff simply had not offered sufficient proof to show the abnormality of defendant's actual business practices.

In the case at bar, the basic question is whether or not it is a normal business practice on the part of Marathon to terminate a filling station lease where the operator is delinquent as to the monthly payments for rent during the fiscal year 1974–75, where the practice had been in previous years to allow the plaintiff to be delinquent on a month-to-month basis, but to make up such delinquencies during the following fiscal year. This is the teaching of *Guyer* to the effect that the actual and practical normal business practice of an oil supplier like Marathon must be examined, for if Marathon has customarily not exercised its rights under service station leases, then that may constitute its normal business practice.

The defendant introduced the testimony of Robert M. Vittitow, its Retail Marketing Manager for the Louisville district, to the effect that the minimum rental deficiencies were collected on a quarterly basis. This answer, found at page 69, line 6, apparently applied to the general policy of the defendant, since the next question and answer relate to the specifics as to the handling of plaintiff's account with defendant.

With respect to the specifics as to plaintiff, Vittitow testified that it was not unusual to let the first year run by and let a deficit occur because of the desire of the company to help first-year filling station operators. He then referred to the second lease year and stated that Mr. Vold was allowed to incur a deficit for that year because he had an extraordinary two months in February and March. This explanation seems to the Court to be a bit of a non sequitur, but at any rate it is undisputed that plaintiff was allowed leniency at the end of the second year as he was at the end of the first year.

Vittitow then went on to explain on page 65 that when it became obvious in plaintiff's case, as in many others with the volume eroding, that the minimum deficit, if allowed to continue, would be a very appreciable amount, the plaintiff was placed on a quarterly basis. He also testified on page 66 that this was not unusual with respect to other dealers.

■ Plaintiff, on his part, offered no proof to counter Vittitow's testimony in this regard, nor did he offer any proof of his own to the contrary opposed to Vittitow's testimony. This being the case, plaintiff has failed to meet the burden of proof of showing that it was contrary

to the actual normal business practices of Marathon to require that he pay his minimum rental deficits every three months rather than during a period following the end of each fiscal year.

Plaintiff complains also as to the action of defendant in placing him on a C. O. D. basis on February 4, 1975. Plaintiff relies upon FEO Ruling 1974–10, Changes in Credit Terms, April 30, 1974. That ruling reads as follows:

"*Facts*: Firm A, a refiner, sold gasoline to Firm B on May 15, 1973, under terms which permitted Firm B to pay for a delivery of gasoline at the time the next delivery was made.

Firm C, a refiner, sold gasoline to Firm D on May 15, 1973, under terms which included a requirement that Firm D make a cash deposit with Firm C as security for prompt payment for the gasoline sold by Firm C to Firm D. The amount of the deposit required of Firm D depended upon Firm D's credit rating and the amount of credit Firm D obtained, which in turn depended upon the volume of purchases, the frequency of payments, and on the price of the gasoline that was purchased.

*Issue # 1*: May Firm A now require Firm B, which has been paying for deliveries of gasoline on a so-called load-to-load basis, to pay for each delivery at the time it is made?

*Issue # 2*: May Firm C increase the amount of the security deposit required from Firm D?

*Ruling*: Firm A may not discontinue its practice of accepting payment for deliveries of gasoline on a load-to-load basis. 10 CFR § 212.82(f)(1)(i) states: 'The base price for sales of an item by a refiner is the weighted average price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, plus increased product costs incurred between the month of May 1973 and measured pursuant to the provisions of § 212.83. In computing the base price, a firm may not exclude any temporary special sale, deal or al-lowance in effect on May 15, 1973.' Price is defined in 10 CFR § 212.31 as 'any consideration for the sale or lease of any property or service and includes rent, commissions, dues, fees, margins, rates, charges, tariffs, fares, or premiums, regardless of form.'

Thus, the May 15, 1973 price includes both the price per gallon of gasoline and the time within which that price had to be paid, i. e., the credit terms that prevailed on that date. The imposition of more stringent credit terms by a refiner would constitute an impermissible increase in the May 15, 1973 price because it would reduce the time within which payment had to be made. The cost of credit for the period between deliveries, which was incurred by Firm A would, if the terms could now be altered, have to be paid by Firm B.

Firm A could change its credit practices with respect to Firm B only if it first applied to the FEO, and made a showing as to why the change was necessary, and if the FEO authorized the change, as well as an appropriate adjustment to Firm A's May 15, 1973 price. The presumption, however, would be against authorizing such changes in credit terms because of the differing impacts they have on Firm A and Firm B because of their differing access to and cost of obtaining credit.

Firm C can increase the amount of the security deposit it requires, but only to the extent that the actual increase in the amount of the security deposit is justified by increased credit being extended to each retail seller because of increases in the price of gasoline or in the volume of purchases. Thus, the percentage increase in the amount of the security deposit required of Firm D can be, at most, the percentage by which the selling price of gasoline to Firm D has increased between May 15, 1973, and the present, adjusted for changes in volume of purchases between May 15, 1973, and the present. Any further increase would be an impermissible in-

crease in Firm C's May 15, 1973 selling price, since it would impose an increased cost of credit on Firm D. Similarly, Firm C could not increase the frequency of payments required of Firm D because to do so would reduce the amount of credit being extended to Firm C."

■ In the case of *OKC Corporation v. Oskey Gasoline & Oil Company*, 381 F.Supp. 865 (N.D.Tex., Dallas Div.1974), the court stated that Ruling 1974–10 is consistent with 10 CFR § 210.62(a) (1974), but side-steps the questions of normal business practices, poor credit risks and past credit experiences between suppliers and purchasers. See 381 F.Supp. at p. 868, footnote 11. While the meaning of 10 CFR § 210.62(a) and FEO Ruling 1974–10 is far from curtailing credit, the Court does not believe it was intended by Congress or by FEO to prohibit all changes in a credit and business relationship between a supplier and retailer of gasoline where their past history indicates that the plaintiff has been a poor credit risk, and that the credit relationship between him and defendant has been unsatisfactory over its entire term.

■ Applying the rationale of *Guyer v. Cities Service Company, supra,* as to normal business practices, we find no evidence produced by either side as to whether it was a normal business practice of Marathon to place its dealers on a C. O. D. basis when there had been a past history of failure to meet the minimum monthly retail payments. Following the thinking of *Guyer*, the burden would be upon the plaintiff to show that this was not a normal business practice of Marathon and this has not been done. We, therefore, conclude that plaintiff has not shown a violation of the regulations which would entitle him to injunctive relief.

The applicable portion of 10 CFR § 210.62(a) is contained in the last two sentences of that subsection. The first sentence, in effect, states that suppliers are not required to sell to purchasers who do not arrange proper credit for payments for allocated products, as customarily associated with that class of purchaser, during the base period for seasonal credit or on May 15, 1973 for other credit terms. The following sentence then states, in substance, that no supplier may require more stringent credit terms or credit schedules than those in effect for that class of purchaser during the applicable base periods.

We come now to plaintiff's contention that defendant has violated the terms of 10 CFR § 210.61 which we have cited on page 6. As we understand that section it prohibits the taking of retaliatory action by any firm or person against any other firm or person who files or manifests an intent to file a complaint of an alleged violation of or an exercise of any rights conferred by the Act. The regulation goes on then to define "retaliatory action" as action contrary to the purpose or intent of the Federal Energy Administration, and states that such action may include a refusal to continue to sell or lease any services or products customarily available for sale or lease.

The Court's interpretation of this section is that defendant in this action could not have taken the action which it did take, of terminating plaintiff's lease in the state courts, if such action had been predicated on any ground which was contrary to the Act or regulations promulgated pursuant thereto. For example, if Marathon and plaintiff had, in effect, a business practice of renewing their leases at the end of each lease year, and no violation of the lease terms was shown, and Marathon simply wished not to renew the lease, this would be contrary to the regulations and any action taken to enforce such decision, such as a forcible detainer action, would be considered retaliatory. However, the definition of the words "retaliatory action" contained in the regulation are not all inclusive and use the word "may" rather than "shall" in connection with a refusal to sell or lease.

■ Furthermore, any action which is to be considered retaliatory must be

contrary to the purpose or intent of the Act or the administration, which administers the Act, and as the Court has previously held, the action of the defendant in insisting upon payment of minimum monthly rental payments on a quarterly basis is not contrary to the purpose or intent of the Act, and hence the filing of the forcible detainer action should not be considered as a retaliatory action within the meaning of the regulations.

■ Finally, the defendant has cited its previous brief in support of its theory that this Court should not enjoin the proceedings in the state court which have already resulted in a finding of guilty in a forcible detainer proceeding against the plaintiff, and in the granting of a writ of possession to the defendant. We again reject the arguments made by defendant in this particular for the reasons stated in our previous opinion. In so doing, we have not overlooked *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482, decided March 18, 1975, which holds that an unsuccessful state court defendant in litigation, which was initiated in state court, should exhaust his state court remedies before seeking relief in the district court, unless he brings himself within one of the exceptions stated in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

We believe that the facts and proceedings in *Huffman v. Pursue, Ltd., supra,* are distinguishable from those at bar and that important matters of federal policy are at issue in this case and should be and have been decided by the district court, free from any deference to a state court proceeding which was initiated following the initiation of this proceeding and which had only very narrow issues presented to it for determination.

Because this Court is scheduled to appear at the Judicial Conference for the Sixth Circuit during this week and will be unavailable to counsel for several weeks, it is believed to be appropriate to stay the enforcement of this order until the Court returns and the parties have

had an opportunity to brief the matter during the Court's absence.

We have, therefore, entered an order this day in accordance with these findings of fact and conclusions of law.