**Donald BURK d/b/a Burk's Gulf, Plaintiff,**

v.

**GULF OIL CORPORATION, a Foreign Corporation, Defendant.**

**No. Cv–74–65–M.**

United States District Court, D. Montana, Missoula Division.

July 11, 1975.

Boone, Karlberg & Haddon, Missoula, Mont., for plaintiff.

Patterson & Marsillo, Missoula, Mont., for defendant.

## MEMORANDUM AND ORDER

WILLIAM D. MURRAY, Senior District Judge.

The pertinent facts culminating in this suit are brief, On June 1st, 1968, plaintiff Donald Burk and defendant Gulf Oil Corporation [Gulf] executed several agreements whereby plaintiff contracted to serve as a branded distributor of Gulf products in Missoula, Montana. Pursuant to these agreements Gulf installed certain equipment at plaintiff's station, including a credit card imprinter. Their relationship continued uninterrupted until August 8, 1973, when Gulf notified plaintiff by letter of its desire not to renew their various agreements when they expired May 31, 1974. Then on May 23, 1973, Gulf advised plaintiff of its intention to remove its equipment and of its desire to terminate its agreements. Gulf offered and continues to offer plaintiff supplies of gasoline on an unbranded basis as directed by the Federal Energy Administration [FEA].

Plaintiff sued, seeking an injunction enjoining termination of the agreements to enable him to continue in business as a branded independent marketer of Gulf products. Gulf counterclaimed [CROSS CLAIM] alleging: (1) plaintiff is indebted to Gulf in the amount of $8,370.-50 for various merchandise furnished by Gulf, and (2) plaintiff has refused to let Gulf remove or pay for certain of its property valued at $4,277.00, which it had installed at plaintiff's station. Gulf seeks orders requiring plaintiff to surrender the equipment, allowing Gulf to terminate its agreements and for judgment on the debt.

The action was commenced in state court May 29, 1974, and on the same day plaintiff obtained an order to show cause and a temporary restraining order requiring Gulf to honor all agreements in force prior to May 29, 1974, and prohibiting Gulf from removing its equipment from plaintiff's gas station. Thereafter, on June 12, 1974, the action was removed to this court under 28 U.S.C. § 1441 et seq. This court's jurisdiction is under 10 C.F.R. 210.83(b) and the Economic Stabilization Act of 1970, § 210 (84 Stat. 799, as amended). The temporary restraining order has remained in effect. 28 U.S.C. § 1450.

The court presently has before it motions for summary judgment submitted by each party. Both movants direct their briefs to the issue of whether Gulf may terminate its various agreements without violating the Emergency Petroleum Act of 1973 (15 U.S.C. § 751 et seq.) [hereinafter referred to as the Act] or any of the regulations promulgated thereunder.

A brief review of the legislative history of the Act is helpful in providing an enlightened background from which to consider the arguments of each side.

### Legislative History

*Guyer v. Cities Service Company*, 381 F.Supp. 7 (E.D.Wis.1974) is a recent case involving the Act where independent branded marketers were denied in-

junctive relief which would have prevented an oil company from terminating their leases and agreements. There the court elucidated the following concerning the history of the Act:

> [T]he legislative history of the Act indicates that while Congress may have been concerned with the plight of the 'independents' . . . Congress did not attempt to solve these problems in the Act.

> In the Senate version of the Act, S. 1570, § 110(a)(2) read: '(2) A petroleum refiner or a petroleum distributor shall not cancel, fail to renew, or otherwise terminate a franchise unless the petroleum retailer or petroleum distributor whose franchise is terminated failed to comply substantially with essential and reasonable requirement of such franchise or failed to act in good faith in carrying out the terms of such franchise, or unless such refiner or distributor withdraws entirely from the sale of petroleum products in commerce for sale other than resale in the United States.'

> The House, however, was of the opinion that the legislation should be concerned solely with the allocation of scarce fuels, rather than attempting to regulate the structure of the gasoline industry. The Conference Committee reported, ' * * * the conferees have determined not to include the dealer protection provisions which were contained in the Senate Bill.' U.S.Code Cong. & Admin.News, 93 Cong., 1st Session, Vol. 2, p. 2707.

> * * * *

Since the dealer protection provisions had been deleted from the Act, the court concluded that Congress was not attempting to regulate an oil company's ability to terminate its agreements with independent branded marketers of its products.

*Retaliatory Action*

Plaintiff argues that Federal Energy Administration [FEA] regulation 10 C.F.R. § 210.61 prevents Gulf from terminating its agreements. The provisions of that section protect an individual from retaliatory actions by a supplier where that individual asserts his rights established under the Act. "Retaliatory action" is defined as ". . . any action contrary to the purpose or intent of the Economic Stabilization Program or the FEA and may include a refusal to continue to sell or lease." 10 C.F.R. § 210.61.

Here plaintiff does not allege that Gulf is terminating their relationship because of any allocations plaintiff received from the FEA. Furthermore, the record indicates that Gulf could not have had a retaliatory purpose proscribed by the regulation since it advised plaintiff of its intention not to renew the agreement in August of 1973, over 3 months before the enactment of the Act (November 27, 1973).

Support for this latter proposition is found in *Russell v. Shell Oil Company*, 382 F.Supp. 395 (E.D.Mich.1974), affirmed 497 F.2d 924 (6th Cir. 1974). In *Russell*, the plaintiff, a gas station operator, sought to enjoin the defendant, Shell Oil Company, from terminating their dealer and lease agreements. Regarding plaintiff's contention that termination of the agreements constituted retaliatory action in violation of Section 210.61, the court said:

> As to Count II, the Court fails to find any application of the Mandatory Petroleum Allocation and Price Regulations. Since the notice that Shell would not renew the agreements was issued on October 16, 1973, prior to the enactment of the Emergency Petroleum Allocation Act of 1973 on November 27, 1973, and before promulgation of the mandatory allocation regulations on January 14, 1974, there clearly could have been no retaliatory purpose in defendant's action in violation of Section 210.61.

Similarly then, Gulf had no retaliatory purpose when it advised plaintiff of its intention to terminate their agreements.

*Normal Business*

Plaintiff also argues that Section 210.62(a) of the regulations prevents Gulf from terminating their contracts. Section 210.62(a) provides in pertinent part:

(a) Suppliers will deal with purchasers of an allocated product according to normal business practices in effect during the base period specified in Part 211 for that allocated product, and no supplier may modify any normal business practice so as to result in the circumvention of any provisions of this chapter.

Plaintiff asserts that terminations of its agreements with Gulf are deviations from the normal business practice as contemplated by Section 210.62(a). In support of this contention plaintiff relies on his affidavit which discloses that Gulf was his supplier in 1972 (the base period) and continued as such in 1973 when the agreements were renewed. Plaintiff contends that the normal business practices contemplated by the regulation included not only continuation of the business relationships whereby plaintiff was a branded Gulf dealer but a renewal of the several contracts giving rise to that relationship.

A similar argument was propounded by the plaintiffs in *Guyer, supra.* There the relationships which some of the plaintiffs had with the supplier had lasted for over 10 years. They argued that the facts of the case indicated that lease terminations were deviations from the normal business practices contemplated by the regulation. The supplier

urged that normal business practices were evinced only by the fact of entering into agreements terminable without cause. Apparently the court found both interpretations too limited as it stated: "the actual and practical normal business practices of [the supplier] must be examined, for if [the supplier] has customarily not exercised its rights under service station leases, then that may constitute the normal business practice." *Guyer v. Cities Service Company, supra* at 13.

Thus the plaintiff's reliance on *his* past relationship with Gulf to establish Gulf's normal business practices ignores "the actual and practical normal business practices" of Gulf. Since plaintiff has not produced evidence that contract terminations are deviations from Gulf's normal business practice there is no genuine issue of material fact for trial on plaintiff's claim under Section 210.62.[1]

Furthermore, the affidavit of J. B. Overstreet, a territorial manager for Gulf, discloses that as of October, 1972, the normal business practice of Gulf included termination of its dealer agreements pursuant to an extensive plan of liquidation of marketing assets in the United States, Europe and South America. Therefore, since it appears that the custom of Gulf was to terminate its relationships with persons such as plaintiff as early as October of 1972 plaintiff's argument to the contrary must fail.

Plaintiff also relies on an FEA ruling interpreting the regulations which is quoted in part in his brief.[2] Even

---

1. Further support for this conclusion is found in *Russell, supra.* There plaintiff contended that Section 210.62(a) provided a basis to enjoin defendant from terminating their dealer agreements. In rejecting this claim the court noted that plaintiff had not established that contract terminations were not the normal business practice of defendant Shell Oil. The court intimated that plaintiff could not rely on his past dealership renewals as evidence that defendant's terminations were not its normal business practices.

2. 5. Withdrawal from a region by a supplier since the base period does not alter the obligations owed to base period purchasers in that region by the supplier. However, certain actions by suppliers, such as cancelling a lease under which a base period purchaser has been operating an ongoing business on premises owned by the supplier may have the effect of putting the purchaser out of business. The regulations provide that purchasers who have gone out of business shall not be eligible for allocations premised on base period supplier relationships. Never-

though the ruling appears to apply since Gulf is engaged in a program of withdrawal there are other reasons why it is inapplicable here. The same ruling was considered by the court in *Guyer*. There the court concluded that the ruling indicated that the failure of suppliers to renew their contracts was not, as such, evidence of non-normal business practices. The court stated: "as long as a gasoline supply is available to the supplier's base period purchasers, lease cancellations were irrelevant." *Guyer v. Cities Service Company, supra* at 13.

Here, as in *Guyer*, the supplier has offered and continues to offer to supply plaintiff with gasoline. Therefore, Gulf appears to be complying with the ruling.

Additional support for the conclusion that the FEA did not intend to regulate franchise terminations is found in recent decisions of that agency. In the *Elwood J. Rokenbrodt Case*, CCH Fed. Energy Guidelines, ¶ 83,066 (decided March 12, 1975) the FEA reemphasized the prior holding of *Greenbelt Consumers Services, Inc.*, CCH Fed. Energy Guidelines, ¶ 20,211 (decided December 17, 1974):

> As we held in [Greenbelt], the FEA Regulations do not prohibit a firm

from exercising private contractual remedies available to it which result in termination of franchise agreements under which a firm previously occupied the status of a branded dealer.

Also, in *Russell, supra*, at footnote six, the court quoted from an FEA letter: "the agency does not attempt to interfere nor interpret the rights and remedies under dealer agreements and leases." Therefore, the ruling relied on by plaintiff does not apply to this case.

*Conclusion*

Since there is no genuine issue as to any material fact concerning the claims asserted by plaintiff, it is ordered that the defendant's motion for summary judgment be and the same is hereby granted.

Defendant will prepare orders dissolving the temporary restraining order and allowing defendant to terminate its agreements with plaintiff.

The court retains jurisdiction of the counterclaim [CROSS CLAIM] since genuine issues of material fact are present.

theless, the Federal Energy Office is prepared to take action to prevent practices by suppliers which have the clear effect of circumventing the provisions of the Allocation Regulations. Suppliers who terminated leases with their base period purchasers in the period following enactment of the Emergency Petroleum Allocation Act of 1973 or whose conduct with respect to base period purchasers otherwise threatens to terminate the latter's ongoing business, may be determined to have engaged in "retaliatory action" within the meaning of Section 210.61 of the Regulations. That section prohibits any action, including a refusal to continue to sell or lease, contrary to the purpose or intent of the Federal Energy Office, when such action is taken against another firm or individual who exercises any rights conferred by the Emergency Petroleum Allocation Act of 1973, or by the Regulations issued thereunder. Furthermore, termination by a sup-

plier of leases with base period purchasers —as part of a program of withdrawal from a region—may be determined to be in violation of Section 210.62 of the Regulations which requires suppliers to deal with purchasers according to "normal business practices" and prohibits modification of "normal business practices" so as to result in circumvention of any provision of the Regulations. Because the Regulations impose a continuing responsibility upon a supplier to provide allocations to his base period wholesale purchasers despite its withdrawal from a region, action which is in furtherance of a program of withdrawal by the supplier from a region may not be considered a "normal business practice" until the Federal Energy Office authorizes a program of reassignment of that supplier's base period purchasers to other suppliers in the region. 39 Fed.Reg. 40467 (Feb. 4, 1975).