**Charles DOYLE, Plaintiff,**

v.

**PHILLIPS PETROLEUM COMPANY, Defendant.**

**No. B–C–75–9.**

United States District Court, E. D. Arkansas, N. D.

Oct. 30, 1981.

---

Hermann Ivester, Little Rock, Ark., for plaintiff.

Isaac A. Scott, Jr., Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

HOWARD, District Judge.

This action involves the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 et seq. (Act) and Regulations adopted pursuant to the Act.[1]

---

1. Section 751(b) of the Act provides:

The purpose of this chapter is to grant the President of the United States and direct him to exercise specific temporary authority to deal with shortages of crude oil, residual fuel oil, and refined petroleum products or dislocations in their national distribution system. The authority granted under this chapter shall be exercised for the purpose of minimizing the adverse impacts of such shortages or

The pivotal issue is whether it was a normal business practice of Phillips Petroleum Company (Phillips) to place Charles E. Doyle, doing business as Doyle Oil Company, (Doyle), on a "cash with order" for petroleum products where Doyle:

1. Had a history of being delinquent in making payments on his account.

2. In July, 1973, submitted a check drawn on an account with insufficient funds for payment of products ordered in July, 1973.

3. During the month of August, 1973, sustained a loss of operating capital when an undetermined amount of diesel fuel spilled on the ground when someone left open a valve on a six thousand gallon fuel tank.

4. During the month of August, 1973, sustained a fire loss to a television and furniture business which resulted in the closing of this business venture.

5. Was unable to obtain loans from his bank to pay for products,

when the practice of Phillips had been to ship products to Doyle on a credit arrangement which provided for payment after delivery of such products with a certain discount allowable for prompt payment as indicated hereafter.

## FACTUAL BACKGROUND

In March, 1972, Doyle purchased an oil and gas distributorship from C. Ray Hanley for $35,000. Hanley received $5,000 as a down payment and agreed to receive the balance in monthly installments over a period of five years. Doyle borrowed $10,000 from the Bank of Tuckerman in order to finalize the sale and commence operations. Hanley subordinated his vendor's lien for his unpaid balance in order to afford the Bank of Tuckerman a first mortgage for its

loan to Doyle. Prior to and since the sale, the distributorship has dealt exclusively in Phillips petroleum products.

On April 15, 1972, Doyle and Phillips entered into a Jobber Sales contract for a term of two years, expiring on April 14, 1974. Under this contract, Phillips agreed to sell and Doyle to purchase light refined products—gasoline and diesel fuel-under the following payment plan:

"... One per cent (1%) discount ... [when] payment in full made within ten (10) days from the date of invoice. However, Seller may decline to make deliveries of petroleum products under this contract except for cash payable upon such delivery, whenever Seller for any reason shall have any doubt as to Buyer's financial responsibility, and shall so advise Buyer; whereupon Buyer shall have the privilege of satisfying Seller of his or its financial responsibility, and if Seller is satisfied, deliveries may again continue hereunder upon the terms in this paragraph specified; *but if Buyer fails to meet the credit requirements of Seller, Seller may terminate this contract immediately without notice; and Seller may exercise its rights under this paragraph at any time and from time to time during the continuance of this contract."* [2] (Emphasis Added)

On March 21, 1974, Doyle and Phillips entered into a new Jobber Sales contract which became effective on April 15, 1974. The terms for payment specified:

Terms of payment shall be in accordance with terms established by Seller from time to time and in effect at time of delivery. Seller, however, may decline to make deliveries of said product under this contract except for cash payable upon

dislocations on the American people and the domestic economy.

Section 753(b)(1)(D) specifies:

The regulation ... shall provide for:

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the compet-

itive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers; ...

**2.** Doyle and Phillips also executed a Lubricating Oil and Grease contract for a term of one year beginning April 15, 1972, and ending April 14, 1973. The terms for payment were the same as those contained in the Jobber's contract.

such delivery, whenever Seller for any reason shall have any doubt as to Buyer's financial responsibility, and shall so advise Buyer; whereupon Buyer shall have the privilege of satisfying Seller of Buyer's financial responsibility, and if Seller is so satisfied, deliveries may again continue hereunder upon the terms of this paragraph; but if Buyer fails to meet the credit requirements of Seller, Seller may terminate this contract immediately without notice; and Seller may exercise its rights under this paragraph at any time and from time to time during the continuance of this contract.[3]

Phillips designated Doyle's credit limit at $15,000. From the very beginning, Doyle encountered credit difficulties in meeting his commitments to Phillips for products delivered. For example, between April 24, 1972, and July 30, 1973, Doyle submitted thirty-one orders for light-refined products, nine of these invoices were paid within ten days from date, while payment of twenty-two of the invoices were delinquent on the average of twenty-three days after the due dates. The delinquency period on an invoice ranged from a minimum of six days to a maximum of 140 days.

Ten orders were submitted by Doyle for tires, batteries and accessories (TBA). Four of these invoices were paid within the allotted time, but six were late ranging from a minimum of thirty-two days to a maximum of 140 days. Doyle submitted six orders for lubrication oil and greases (oil), all of which were paid late, ranging from a minimum of twenty days to a maximum of 140 days.

During the early part of 1973, Doyle was placed under "a shipment control on light-refined products" which required Doyle to make payment for an amount "equal to or in excess of his order placed to No. 1" in an effort to bring Doyle's account into dis-count—1% discount on invoices paid within ten days of the date of an invoice. Under this arrangement, Doyle's account was within discount by May, 1973, but past due invoices began accumulating, again, almost immediately.

On August 23, 1973, a check for $1,760.13, which Doyle had transmitted to Phillips previously for payment of an invoice, was returned to Phillips because of insufficient funds. This check was not made good until approximately fourteen days after Doyle was notified of the returned check.

Also, during the month of August, 1973, Phillips received information that Doyle had sustained a loss of an undetermined quantity of diesel fuel that spilled on the ground when a valve of a six thousand gallon storage tank had been left open. Phillips further discovered that during August, 1973, Doyle sustained a fire loss to his television and furniture business and, as a consequence, this business was closed.

On October 5, 1973, Phillips, in accordance with its normal business practice, placed Doyle on a cash basis—cash submitted in advance with orders for products.

The record supports a finding that Doyle was also engaged in a trucking business. Charles Mann, Phillips district manager, testified that he visited Doyle's premises, in connection with Phillips' policy to assist dealers in marketing products, during the latter part of 1974, on the average of twice monthly and that he had difficulty finding Doyle at the business; that he was informed that Doyle was "off running a truck." Doyle closed his petroleum business during the last of 1974.

Doyle contends that he did not receive notice of the credit change requiring cash with orders until January, 1974, when he attempted to order products and was advised of the change,[4] and, moreover, that Phillips instituted a credit change which did

---

**3.** On March 31, 1974, Doyle and Phillips executed a Lubricating Oil and Grease contract for a term of one year beginning April 15, 1974, and ending April 14, 1975; this contract was still in force at the time this action was instituted. The terms of payment under this agree- ment were the same as reflected in the Jobbers contract executed April 15, 1974.

**4.** Section 210.62 of Regulations promulgated under the Act, discussed hereafter and relied upon by Doyle, became operative on January 14, 1974.

not conform to its normal business practices; and the credit change not only violated the terms of the contract between the parties, but the Regulations promulgated under the Act equally as well.

Doyle also contends that as a direct consequence of the credit change and the refusal of Phillips to deliver petroleum products unless the cash was submitted with the order, Doyle was precluded from meeting the needs of his business and has suffered damages in the sum of $390,000.[5]

Between 1972 and 1973, the Bank of Tuckerman loaned Doyle $40,000. As of January 1, 1974, Doyle's indebtedness had been reduced to $25,000, but the account at that time was past due. In 1976, the Bank instituted foreclosure proceedings on the mortgage it held against Doyle's petroleum business—land, building and equipment—as security. The property was sold at a foreclosure sale for $5,500. There is still an unpaid balance due the Bank in the sum of approximately $20,000. Doyle owed Hanley, at the time of the foreclosure sale, $22,000 on the original purchase price of the business.

On March 21, 1974, Doyle and Phillips executed the following mutual cancellation agreement.

In consideration of the mutual release by each party of the obligations imposed upon the other, and of good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged and confessed, each of the parties hereto agrees that the following written contracts between the parties hereto shall be and are hereby cancelled and terminated, effective the 14th day of April, 1974.

1. Jobber Sales Contract, dated April 14, 1972, for the primary period beginning April 15, 1972, and ending on April 14, 1973, and thereafter as therein specified.

2. Lubricating Oil and Grease Contract, dated April 17, 1972, for the primary period beginning April 15, 1972, and ending April 14, 1973, and thereafter as therein specified.

## DISCUSSION

Section 210.62 of the Regulations provides:

Suppliers will deal with purchasers according to normal business practices. Nothing in this program shall be construed to require suppliers to sell to purchasers who do not arrange proper credit or payments for products. However, no supplier may require or impose more stringent credit terms or payment schedules on purchasers than the normal business practice of the supplier for that class of purchaser (e. g. COD purchasers) during the base period, nor may any supplier modify any other normal business practice so as to result in circumvention of any provision of this chapter.

In resolving the issue relating to the Act and the Regulations relied upon by Doyle for relief, the Court must scrutinize the actual, practical and normal business practices of Phillips in order to determine whether the credit change requiring Doyle to submit cash in advance is a normal business practice of Phillips. This necessarily includes the determination whether Phillips instituted the change, if found to be a normal business practice, as a subterfuge for circumventing the Congressional purpose for which the Act and Regulations were designed to accomplish. Concomitantly, Doyle, as plaintiff, has the burden of proof to demonstrate that the credit change violates the Regulations and that the credit change is not in actuality a normal business practice. *See: Guyer v. Cities Service Co.,* 381 F.Supp. 7 (D.C.Wis.1974); *Vold v. Marathon Oil Company,* 407 F.Supp. 1011 (D.C. Ky.1975).

Richard Nygaard, Financial Service Area Manager for Phillips, testified that he had been employed by Phillips for thirty years; that his prime responsibility consisted of

---

**5.** In 1972, Doyle lost $12,000 in the operation of his petroleum business; while making a profit of $3,100 in 1973 and a profit of $3,500 in 1974.

making credit arrangements and selections for marketing districts and territories which include the State of Arkansas. Nygaard stated that he was personally familiar with the history of Doyle's account inasmuch as he is the custodian of the records of Phillips and that he personally established the credit limit and set the terms for the sale of products for Doyle.

On October 5, 1973, Nygaard instructed Dean Williamson, Nygaard's financial services assistant, to place Doyle's account on "cash with order." Nygaard stated that the credit change was instituted after a series of events took place during the month of August, 1973, when considered in conjunction with Doyle's history of delinquencies in making payments on his account, established that Doyle was "a definite financial problem" and a poor credit risk. These events were: (a) payment for supplies with a check drawn on an account with insufficient funds, (b) the delay in making the check good, (c) the loss of capital goods and (d) the closing of a television and furniture business as a consequence of a fire.

Doyle was notified immediately of the credit change by Williamson and Charles Mann, a district representative, who called upon Doyle biweekly as a district representative was required, in connection with Phillips' policy to render assistance to dealers in marketing and related problems.

Nygaard testified that any jobber in his territory who might have been confronted with the same set of circumstances, as experienced by Doyle, would have been placed under the same credit term requiring cash in advance. Moreover, Nygaard stated that there were approximately nine or ten other jobbers who were operating under the credit term of "cash with order."

While a jobber may be required to submit cash with order for products, when Phillips is persuaded that he has become a poor credit risk, a jobber may purge himself of this requirement and reestablish his "credit line" by furnishing evidence of his financial responsibility. Phillips afforded Doyle an opportunity to demonstrate his financial capability, but the record is void of any evidence that Doyle ever responded.[6]

"Cash with order" has been a credit practice that Phillips has utilized, when conditions so warrant, with its jobbers "over the period of years." Phillips, however, has some reluctance in employing the "cash with order" policy since the practice is time consuming, requires manual records of accounts, maintenance of a log, receiving and making telephone calls, while orders received under normal credit relations are processed by computers, thus avoiding the extra time and efforts associated with prepaid orders.

■ Doyle has offered no evidence to show that Phillips' credit change to "cash with order" is not a normal business practice and is but a subterfuge to circumvent the Act. Doyle argues that he did not receive notice of the credit change until January, 1974, but the record reflects that on October 31, 1973, Doyle placed an order for light-refined products which amounted to $3,742.38, and the order was characterized as "cash sale." This was in Doyle's own handwriting. The order also identifies the instruments and credit accompanying the order in payment of the requested products as: (1) a credit allowance in the sum of $387.48 for the return of thirty-five tires on October 28, 1973; (2) "ck # 287, $1,000.00", dated October 31, 1973; (3) "ck 7853, $1,500.00", dated October 30, 1973; and (4) "Check No. 3283, $854.90", dated October 30, 1973.

It is clear that between April, 1972, and September, 1973, Doyle submitted approximately forty orders and none of these was designated as "cash sale."[7]

---

**6.** The Jobber and Oil contracts provide in relevant part: "Buyer shall have the privilege of satisfying Seller of his or its financial responsibility, and if Seller is satisfied, deliveries may again continue...."

**7.** Doyle argues that the order of October 31, 1973, defendant's exhibit 11, refutes, rather than supports, Phillips' argument that Doyle was knowledgable of the credit change, that

The Court is persuaded that Doyle received notice of the credit change on October 5, 1973, and indeed, prior to January 14, 1974, the effective date of § 210.62 of the Regulations. The Court has given considerable weight to the testimony of Nygaard, Williamson and Mann in arriving at this finding.

■ Doyle argues that Phillips' action in requiring cash in advance has, in effect, withdrawn the option of COD payments with respect to an entire class of purchasers-purchasers "Phillips doubted financial responsibility." Doyle cites *In Re Exxon Company v. U. S. A.*, 2 DOE ¶ 80, 150, CCH Energy Management Transfer Binder (1978) in support of his position.

*Exxon* is to be distinguished and, accordingly, is inapplicable here. *Exxon* withdrew credit privileges from consumers and retailers who held Master Charge Cards and Bank Americards, but the action was inapplicable to holders of Exxon cards. Moreover, the termination of the credit card program was not based on credit worthiness or financial need, or related to any factor peculiar to a particular customer. The Department of Energy found that consumers had been affected adversely by the termination of bank credit cards and that the action resulted in the imposition of more stringent credit terms than those in existence on May 15, 1973. Exxon's action affected an entire class of consumers and retailers.

Phillips' action does not involve an entire class, but only an individual member of a class who, by virtue of a series of events, and a history of delinquencies in meeting his obligations, has been determined a poor credit risk.

Mr. Nygaard testified that there were jobbers who received products COD and that there were jobbers who were on "cash in advance" because of their individual peculiar circumstances. There is no evidence that Phillips has terminated its entire COD arrangement. Mr. Nygaard also stated that he had personal knowledge that there were nine or ten "cash in advance jobbers." The evidence also reflects that there were approximately four jobbers who received products COD.

Doyle argues that the contracts do not authorize a change to cash in advance, but allows only cash upon delivery which means literally collect on delivery. Consequently, argues Doyle, when Phillips imposed cash in advance, it breached the contracts between the parties, and more particularly, the contract of April, 1974.[8]

The applicable provision provides:

. . . Seller may decline to make deliveries . . . except for cash payable upon such delivery, when ever Seller for any reason shall have any doubt as to Buyer's financial responsibility, and shall so advise Buyer, whereupon Buyer shall have the privilege of satisfying Seller of his or its financial responsibility, and if Seller is satisfied, deliveries may again continue here under upon the terms in this paragraph specified, but if Buyer fails to meet the credit requirements of Seller, Seller may terminate this contract immediately without notice; and Seller may exercise its rights under this paragraph at any time and from time to time during the continuance of this contract.

---

reference to plaintiff's exhibit 8–a schedule of all payments received from Doyle for products shipped between 1972 through 1974—shows "conclusively" the remittance was for payment of products shipped on October 29 and 30, 1973, and hence was not a prepaid order.

The Court has compared the order of October 31, plaintiff's exhibit 8, and plaintiff's exhibit 10, the invoices prepared by Phillips for products purportedly shipped to Doyle on October 29 and 30, 1973. The order of October 31 differs with reference to the quantity of products ordered and the amount due or remitted as reflected on plaintiff's exhibits 8 and 10.

8. Doyle also argues that if Phillips had shipped products COD, he could have readily acquired funds from the Bank of Tuckerman since the Bank could have been assured of a perfected security interest in products in Doyle's possession. This argument brushes aside completely the concept of inventory financing which is permissible under Arkansas' Uniform Commercial Code, Ark.Stat.Ann. §§ 85–9–301, *et seq.*, where a lender acquires a lien before products are shipped. Moreover, Van Smith, President of the Bank of Tuckerman, stated that the Bank had done inventory or floor plan financing for Doyle "when he was in the furniture business."

Under the contracts, Phillips was free to terminate the contracts without notice when Doyle failed to submit a financial statement. Instead, Phillips instituted its normal business practice of cash in advance.

The question to be resolved here is whether Doyle has a cause of action against Phillips where Phillips had a clear right to terminate the contracts, but extended to Doyle something less than termination.

■ The Court is persuaded that inasmuch as Phillips possessed the option to terminate or not terminate the contracts, it may not be required to respond in damages for its refusal to ship products cash payable upon delivery. Moreover, since Doyle was the initial party to breach the contracts, he is in no position to take advantage of a purported later breach. *See: Anheuser-Busch, Inc. v. Jefferson Distributing Company, Inc.*, 353 F.2d 956 (5th Cir. 1965); *Cummings v. Lord's Art Galleries*, 227 Ark. 972, 302 S.W.2d 792 (1957); *Ben F. Levis, Inc. v. Collins*, 215 Ark. 172, 219 S.W.2d 762 (1949); *Grayling Lumber Co. v. Hemingway*, 128 Ark. 535, 194 S.W. 508 (1917).

■ Furthermore, it must be remembered that the purpose of the Act is not to require suppliers to sell to purchasers who are poor credit risks, but, on the contrary, to allocate petroleum products on an equitable basis and to establish fair ceiling prices. The credit change was a normal business practice which Phillips has utilized over the years in dealing with jobbers similarly situated as Doyle. The Court is also persuaded that the credit change was not instituted for the purpose of circumventing either the Act or the Regulations. Phillips was endeavoring to get paid for products desired by a jobber who was unable to persuade his bank to extend further credit because all of his assets were already under mortgage; and the bank was unwilling to accept any additional unsecured notes.

In arriving at these findings and conclusions, the Court has given substantial weight and credit to the testimony of Nygaard, Williamson and Mann.

Doyle's complaint is dismissed with prejudice.

IT IS SO ORDERED.